JAMES L. TEAGUE *v.* STATE OF INDIANA.

[No. 1276S457. Filed July 28, 1978.]

*James E. Freeman, Jr., Sansberry, Dickmann, Dickmann & Freeman,* of Anderson, for appellant.

*Theodore L. Sendak,* Attorney General, *Kenneth R. Stamm,* Deputy Attorney General, for appellee.

PIVARNIK, J.—Appellant Teague was charged with first-degree murder and tried by a jury in the Madison Circuit Court. At the close of the evidence for the state, appellant moved for a directed verdict in his favor regarding the charge of first-degree murder. The trial court granted this motion and the trial proceeded. After the close of all the evidence, a second motion for a directed verdict was overruled and the jury, on June 14, 1976, returned a verdict of guilty of second-degree murder. Appellant was sentenced to imprisonment in the state prison during life.

The murder in question occurred on the evening of August 16, 1975. Appellant James Teague was driving his Chevrolet pickup truck on Anderson Street in Elwood, Indiana, when he suddenly turned into an alley in which the victim, Daniel Haynes, was walking. Appellant almost struck the victim. Daniel Haynes climbed over the hood of the truck, and approached the window at the driver's side. At this time the appellant and the victim were heard to argue with each other loudly, and to exchange blows at the window of the truck. Appellant Teague was then seen to lean over and reach down

toward the passenger side of the cab, at which time Daniel Haynes bolted and ran from the scene. The victim exited the alley and ran down the sidewalk on Anderson Street. The appellant came around the corner and fired a .22 semi-automatic rifle at him four times. The victim fell to the sidewalk, and appellant then got back in his truck and left the scene. He later surrendered himself to the police, on the advice of his attorney, at the home of his sister-in-law in Anderson, Indiana. Four eyewitnesses testified as to the events above set out.

Witnesses further testified that the Elwood Chief of Police came on the scene a few minutes after the shooting, and found the victim lying on his back on the sidewalk. The victim was having difficulty breathing and talking, but was able to tell the Chief of Police, when asked, that Butch Teague had shot him. Appellant testified in his own behalf in the trial and stated that the victim was choking him in the pickup truck, and that he reached for the rifle to defend himself to use as a striking weapon to ward off this attack by the victim. At this point, appellant testified he thought the gun may have discharged, although he was not sure. Appellant further testified that when he shot the rifle out on the street, as the victim was fleeing the scene, he shot in the air and not at the victim. Appellant stated that this was done in an attempt to frighten the victim, so that he would attack no more. There was further evidence, presented by the state, that the victim had been shot in the back with a rifle slug. This slug was recovered from the victim's chest area, and caused his death within a matter of hours. By ballistic test, this slug was proven to have come from the rifle, owned by the appellant, that had been fired that night.

Several errors are claimed on appeal, which we group and discuss as they relate to the following concerns: (1) admission of evidence gathered from an allegedly unconstitutional search and seizure; (2) admission of the victim's dying statements to the police; (3) admission of a photograph of

appellant; (4) admission of shirts, worn by the victim and appellant, respectively, at the time of the incident in question; (5) exclusion of evidence about the character of the victim; (6) incidents of alleged prosecutorial misconduct; (7) the husband-wife privilege, as it relates to the testimony of certain rebuttal witnesses for the state; (8) the giving of certain final instructions tendered by the state; (9) the refusal of certain final instructions tendered by appellant; (10) the sentencing of appellant; (11) sufficiency of the evidence, and; (12) certain alleged "fundamental errors," the consideration of which should assertedly bypass normal appellate procedure.

## I.

The first error assigned by appellant is that of the trial court denying his Motion to Suppress admission into evidence of the rifle in question, which was found in an outbuilding on appellant's premises.

Shortly after the events set out above, several members of the Elwood Police Department went to appellant's home to apprehend and arrest him. Although members of the police department were in the process of obtaining a search warrant, none had yet been obtained and none of the officers on the premises had such a search warrant. This fact is stipulated to by all parties, and it is further stipulated to by all of the parties that the officers had facts that constituted probable cause for the arrest of appellant. When the officers arrived at appellant's home, they observed his pickup truck parked four or five feet from the door of the outbuilding very near to the residence. The appellant's wife told Officers Dotson and Stevens that appellant was not at home. Thereupon Officer Dotson walked over to the parked truck and felt the hood, noticing that the hood was warm. He then proceeded to the garage, located about five feet in front of the parked truck, knocked on the door and called for Mr. Teague to come out. He then shined his flashlight through the window

into the building and was able to see a .22 caliber rifle sitting inside the door and leaning against a bench or shelf. This outbuilding was partitioned into rooms, but the police were not able to see into the rooms other than the one containing the rifle and other items. The officers forced the door and obtained possession of the rifle. Ballistics tests later indicated that the fatal bullet came from this rifle, and that it was the same weapon owned by and used by the appellant on the night of the killing.

It is appellant's position that the police officers violated the Fourth Amendment of the United States Constitution, as applied to the state of Indiana through the Fourteenth Amendment, by their failure to obtain a search warrant prior to entering appellant's garage. Appellant concedes that the officers had a right to initially go upon the real estate to make an inquiry as to appellant's whereabouts. His position, however, seems to be that after the appellant's wife had informed the officers that the appellant was not at home, it was their duty to immediately leave the premises and search no more. At that point, the argument goes, the police became trespassers on the property. Appellant further argues that since the police officers were trespassers of the curtilage of his premises, then their obtaining of the rifle without a search warrant cannot be justified by the plain or open view doctrine authorized in *Paxton* v. *State*, (1970) 255 Ind. 264, 263 N.E.2d 636, and *Alcorn* v. *State*, (1970) 255 Ind. 491, 265 N.E.2d 413.

Appellant's position would have merit if the police at this point were not aware that a crime had been committed, and were in the process of searching for evidence to gain probable cause. If such were the case, the police would have merely been looking for evidence that would tend to substantiate their suspicion that items might be found on the premises, so to prove that appellant was guilty of a crime or was committing some crime on the property. The police here, however, were not looking for evidence against appellant in the buildings. They were looking for appellant himself, as evidenced by the

facts that they talked to his wife about his whereabouts, called out his name, and attempted to effect his surrender and arrest. It is conceded that the police had a right to be there for the arrest of appellant, and were in the process of making a determination of whether or not he was there. The fact that appellant's truck was parked four or five feet from the garage, and that the motor was still warm, gave them reasonable grounds to suppose that he might be hiding in the building. They had a right and a duty to make that determination by investigating, not only to fulfill their duty of arresting appellant for the protection of society, but also to protect themselves. The facts in this case are similar to those in *Warden* v. *Hayden*, (1967) 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, in which the United States Supreme Court held:

> "We agree with the Court of Appeals that neither the entry without warrant to search for the robber, nor the search for him without warrant was invalid. Under the circumstances of this case, 'the exigencies of the situation made that course imperative.' McDonald v. United States, 355 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153. The police . . . acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would greatly endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." 387 U.S. at 298-99, 87 S.Ct. at 1645-46, 18 L.Ed.2d at 787.

Here, the officers could not see all the interior of the garage, and the presence of appellant's truck could easily have led them to believe that the rifle would be used to effect an escape or be used against them. Since they had a right to be where they were and to take the action they did, the seizure of the rifle was proper and the rifle was properly admitted into evidence.

Appellant's Motion to Suppress also went to the impounding of appellant's truck, the admission of shell casings, and ballistics tests of the rifle. All of these other items were obtained after a search warrant had been issued and had been brought to the scene. Inasmuch as we have found that the rifle was properly obtained, the trial court properly denied appellant's Motion to Suppress in all specifications.

## II.

The appellant further contends that the trial court committed reversible error by admitting "hearsay evidence" of the victim's statement to the Chief of Police that, "Butch Teague shot me." This statement was made by decedent in answer to a question put to him by the Chief, to the effect of, "who shot you Danny?" It is the contention of the state that this statement is admissible as an excited utterance, and is a matter within the discretion of the trial court. *Kreuger* v. *Newmann,* (1959) 129 Ind. App. 300, 154 N.E.2d 741.

This court faced the same question in *Walker* v. *State,* (1976) 265 Ind. 8, 349 N.E.2d 161, *cert. denied,* (1976) 429 U.S. 943, 97 S.Ct. 363, 50 L.Ed.2d 313. In the *Walker* case, the first police officer to arrive on the scene asked the decedent who shot him and he responded, "A boy named Terry." In a unanimous opinion written by Justice Prentice, this court held that the issue is whether the speaker is still under the influence of the exciting event, or has had time for reflective thought, considering the nature of the event and his concern with it. We find this case meets that test, and the court did not abuse its discretion in allowing the statement into evidence.

## III.

The next assignment of error by the appellant is the admission into evidence, over objection, of a photograph of appellant as a state's exhibit. Witnesses for the state testified that this photograph was taken of appellant either the day

he was taken into custody or within two or three days of that time. The purpose of its admission was to give a facial view of appellant, to determine whether or not any bruises or abrasions were apparent.

Appellant's objection to this exhibit was that it was a mug shot, and was prejudicial to him in that it gave the jury an impression that he had a criminal record. He cites as his authority *Blue* v. *State*, (1968) 250 Ind. 249, 235 N.E.2d 471, 30 A.L.R.3d 902, and *Vaughn* v. *State*, (1939) 215 Ind. 142, 19 N.E.2d 239. Those cases, and others cited therein, discuss the typical police mug shot which shows the well-known frontal and profile view of a person with prison numbers and legend thereon referring to arrests or convictions. The problem with the admission of such mug shots is that there is an implication that pictures were taken some time in the past when the defendant was charged or convicted of past crimes. These pictures thus prejudice the defendant, to an extent that outweighs the value that may be gained from the admission of the exhibit for the purported purpose it is offered.

The photograph admitted in the present case is not such a mug shot. It is a frontal view of appellant, in color, of the type that might be produced by a typical box or polaroid camera familiar to an average citizen. There was some typed data at the bottom of the picture, which carried identification features of appellant and the date on which it was taken. These numbers were taped over before it was shown to the jury, so that it was not apparent to the jury when it was viewed by them. The date on the photograph under the tape was August 16, which coincided with the testimony of the officer who identified it. This officer testified that this photograph was taken on that day, incident to appellant's arrest for the purpose of showing his facial features on that day. It, therefore, did not have the prejudicial implications that concerned *Blue, supra,* and

*Vaughn, supra.* The trial court accordingly did not commit error by admitting it into evidence.

## IV.

Questions concerning the admissibility of two shirts, worn by the victim and appellant, respectively, at the time of the crime, are next brought forward. Appellant contends that the trial court committed reversible error by allowing into evidence the shirt that the victim was wearing at the time he was shot. This shirt bore the identification number of exhibit 26, and was offered by the state through witness Hill, who was the coroner of Madison County at that time. The coroner testified that he obtained the shirt on August 16, 1975, from the body of the deceased, and that he took it to his funeral parlor in Chesterfield and put it in his preparation room. Some months later he took it to Officer Davis of the Elwood police department, for purposes of having it examined with reference to blood and powderburns that could be found on it. Since Officer Davis indicated he only needed one portion of the shirt, it was torn in half and the remaining half was retained by the witness. The half to be examined was left in the custody of Officer Davis. The witness further stated that after this time, he and Officer Davis put identifying marks and tags on the exhibit, and that those marks and tags appeared on the shirt at the time he examined it while on the stand. The witness stated that his examination of the exhibit indicated to him that this was the same shirt that he obtained from the body of the deceased on August 16, 1975.

The only objection to this exhibit by appellant was that a proper chain of custody had not been established for its admission into evidence. The state contends that due to the character of this exhibit, any doubts as to the custody of the garment would go to its weight only, and that the jury could consider such doubts in determining its weight. This court faced a similar problem in *Guthrie* v. *State*, (1971) 254

Ind. 356 at 363-64, 260 N.E.2d 579 at 584, where it was stated that:

"Appellee has cited several cases the holdings of which indicate that all possibility of tampering need not be excluded; upon reasonable assurance that the exhibit has passed through the various hands in an undisturbed condition its admission is proper and any remaining doubts go to its weight only. . . . We believe that such a rule is well-grounded in logic and reason."

*See also Johnson v. State,* (1971) 255 Ind. 589, 266 N.E.2d 57; *Wheeler v. State,* (1970) 255 Ind. 395, 264 N.E.2d 600.

We cannot but observe that this exhibit could have been handled by the state in a more professional manner. However, it was sufficiently identified by the witness, so that the jury could consider its weight. Furthermore, in view of all of the other evidence submitted in this cause which we will discuss in more detail regarding a sufficiency question later in this opinion, it does not appear that its exhibition to the jury had an impact on the jury that would be unduly prejudicial to the appellant in arriving at their verdict. We therefore do not find its admission reversible.

Appellant next complains that the court erred by sustaining the state's objection to defense exhibit no. 4, which was the shirt worn by appellant on the evening of the alleged crime. Appellant did not offer this exhibit until he was on re-direct examination by his own attorney. On cross-examination he had told the prosecutor that there was a two or three inch rip on his shirt just below the collar, and that a button was pulled off by the victim during the altercation. He stated that he did not show the shirt to the police nor tell them about it because he had gone home and changed clothes prior to the time he was arrested, and did not have this shirt with him. It was also established that he had never produced the shirt for the state to examine at any time prior to the moment he offered it in evidence, when

he was back on re-direct examination. The court found that there had been a discovery procedure entered into by the parties and followed during the course of pre-trial procedures, in which all items intended for admission and all witnesses intended to be called were exchanged by the attorneys for the parties. Inasmuch as this item had not been made available for discovery, the court sustained the objection at trial to its admission. We find the court did not abuse its discretion in this matter, and the failure to admit the exhibit into evidence so that the jury might view it was not so prejudicial to appellant as to be reversible error.

## V.

The appellant next contends that the trial court erred by incorrectly sustaining state's objections to testimony offered by him concerning the character of the deceased for turbulence and violence. Although appellant has used the language "turbulence and violence," the proper inquiry would be that person's reputation for peace and quietude.

The excluded testimony was presented as follows. On cross-examination of state's witness, Police Officer Jerry Stevens, appellant's counsel asked the following question: "Are you acquainted with his [deceased Danny Haynes] general reputation?" The court sustained an objection to this question. The defense then asked the following question, "Officer Stevens, do you know whether or not the decedent Daniel Haynes has a criminal record?" The court again sustained the state's objection to this question.

As a general rule the character of the deceased is not an issue in the trial for homicide, and evidence to show his general reputation as a dangerous and violent man is inadmissible. An exception to the general rule is the existence of the issue of self-defense. *Madison* v. *State,* (1971) 256 Ind. 353, 269 N.E.2d 164; *Osburn* v. *State,* (1905) 164 Ind. 262, 73 N.E. 601. *Madison* went on

to say, however, that there ought to be some other appreciable evidence of the deceased's aggression substantiating the self-defense issue before such testimony is relevant and admissible. The court in *Madison* found that there was no such evidence forthcoming, and held that the evidence was properly excluded.

At the time that Officer Stevens was testifying in the state's case-in-chief herein, the evidence was that the appellant shot the deceased in the back while the deceased was running away from him and at some distance. It was therefore proper at this point for the court to exclude evidence sought to be obtained by the appellant in cross-examining this witness. When appellant was on the stand, he testified that he was not aware that decedent was in the alley at the time he, the appellant, turned the pickup truck into the alley, almost striking the decedent. He stated that thereupon the decedent attacked him in the truck and attempted to choke him and that he, the appellant, was fearful of is life because he was aware of the violent nature of Danny Haynes. Appellant refers us to one point in the transcript which indicates that the court did sustain the state's objection to his testimony about acts of violence of decedent in his knowledge. However, an examination of the entire testimony of the appellant shows that he did, later in his testimony, testify at length and in detail about the same acts of violence, and was permitted to fully recount them to the jury. The record therefore does not bear out appellant's allegation that he was deprived of presenting this issue to the jury, to substantiate his claim that he had a right to feel that he was justified in acting in self-defense because of his fear of the victim. A further examination of the transcript reflects that appellant neither called nor attempted to call any other witness in his case-in-chief in an attempt to inquire into the reputation for peace and quietude of the victim. Furthermore, the court permitted the appellant five final jury instructions, and did in fact give these five instructions to the jury, which fully explained the self-defense issue

raised. Appellant's allegations of error in this regard are accordingly without merit.

## VI.

Appellant next charges that the trial court erred in overruling his Motion for a Mistrial based upon prosecutorial misconduct. Appellant raises several issues under this heading that could have more properly been raised under a different heading. However, we will examine them at this point since they raise issues that do require resolution.

We first observe, after examining the entire transcript, that there are several instances throughout the trial when the court found it necessary to admonish counsel for both sides for improper questions, or improper statements, made before the jury. On each of these occasions, the court admonished the jury to disregard said statements and to consider only the evidence in arriving at a verdict. There were times when both the prosecuting attorney and defense counsel moved for mistrial because of such conduct, and each time the court overruled said motions with the admonishments above indicated. Although no actual count was made, it did appear that there were more times that this was done in regard to the prosecuting attorney than it was done in regard to defense counsel.

The first complaint appellant makes with regard to prosecutorial misconduct is that the deputy prosecuting attorney did ask appellant whether he gave a statement to the police. He was also asked if he had an opportunity to appear before the grand jury, and refused such opportunity. Appellant did confirm that he had such opportunity and did refuse it. He also indicated to the prosecuting attorney that he did not give a statement to the police at the time of his arrest. The appellant claims that this inquiry into his pre-trial silence was prejudicial, and outweighed the probative value of the fact that he chose to stand on his *Miranda* rights to remain silent. *Cf. United*

*States* v. *Hale,* (1975) 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99; *Grunewald* v. *United States,* (1957) 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931.

The record reveals, however, that appellant himself raised these issues, and the state was therefore permitted to further examine the witness in regard to these issues after the facts had been so opened. When Officer Dotson was testifying for the state, appellant examined him in detail as to anything appellant had said to him or any statement appellant had given to him at that time. The officer testified, in response to that questioning, that appellant had indicated to him that his lawyer had told him not to tell him anything, so he was not going to make any statement. The prosecuting attorney examined Officer Dotson in re-direct examination on this same point. Defense counsel at one point started to object, but on being reminded by the court that he had opened the subject, defense counsel admitted that he had indeed opened the subject and withdrew any objection to it.

A similar situation occurred when appellant was on the stand and under cross-examination by the prosecuting attorney. Appellant again admitted that he had opened the subject of any statements made or information about his activities on the night of the shooting, and he therefore withdrew any objection to the state's examining him with reference to these facts. The holdings in *Hale, supra,* and *Grunewald, supra,* therefore do not apply to the facts of this case, as appellant in his own defense brought these issues before the jury, and the state was permitted therefore to go into them on examination of the witnesses.

A further question is raised regarding the cross-examination of appellant by the deputy prosecuting attorney. After answering questions in which he admitted he had been convicted of two prior felonies, appellant was asked whether or not he had been convicted of theft on June 21, 1967. He first denied that he had, but on further examination he admitted

being in court charged with having stolen property in his possession, apparently not remembering for sure what he was convicted of. There was some discussion between the court and counsel as to whether or not a theft conviction in the city court would be a felony. It was determined that theft is a felony even though the conviction is in a city court and the penalty may be less than a year. No further objection was made by the defense at this time as to this testimony, nor was there any motion to strike or withdraw the submission from the jury. On re-direct examination appellant testified that he was in court on the date in question, but he did not think he had been convicted of theft; he said he thought it was something else. Appellant admitted he had been convicted of entering to commit a felony and served time in the state reformatory in 1970. It appeared that there was some confusion involving a conviction for theft in April of 1975 and the June 1967 incident. The confusion seemed to be as to what the charges were and what the convictions were for on those dates and times. The confusion seemed to rest in appellant, when at one time he stated he had been convicted of something on those dates and at another time would state that he had not been convicted of anything. He discussed it fully before the jury in response to questions by his own attorney on re-direct examination, and did not raise the question before the trial court that he now raises here in review. In view of all the facts and circumstances of the testimony on this subject which we have above recited, and in view of the fact that appellant did not raise the question before the trial court, we cannot say that appellant was unduly prejudiced in this regard.

As we stated above, there were many instances throughout the trial when the court found it necessary to admonish either one or the other trial counsel in regard to their conduct before the jury. In each instance the court openly and fairly instructed the jury on the duty they had in disregarding these matters. In *Frances* v. *State,*

(1974) 262 Ind. 353 at 356-57, 316 N.E.2d 364 at 366, this court stated:

> "This Court has often stated that the granting of mistrials rests largely within the sound discretion of the trial judge. . . . Absent an abuse of that discretion, namely facts or circumstances indicating that the appellant was significantly prejudiced to the extent that the possibility of a fair trial was substantially subverted, we will not disturb the trial court's decision. We are unable to discern any serious injury suffered by the appellant, particularly in light of the curative action taken by the trial court. We must remind the appellant that he is entitled to a fair trial, not a perfect one. We believe that essential fairness and jury impartiality were preserved as best as possible by the trial court."

We do not find here that any of the incidents referred to by appellant significantly or substantially prejudiced him to the extent that a fair trial was impossible. The court took prompt curative action and ably and fairly handled the matter.

## VII.

On direct examination appellant testified that he had a sore throat, and after watching television for some time with his family decided at about 12:30 a.m. to go to Carter's grocery in a shopping center located on the other side of the town of Elwood, to get some medicine to relieve his sore throat. He said that he had a wiring problem with his truck that caused it to die when he came through the intersection approaching the alley. Thus, he testified, he turned into the alley to get off of the traveled portion of the street. He stated he did not know the victim was in the alley when he turned into it, and was surprised when he was attacked by the victim after bringing his truck to a stop in the alley. On cross-examination, appellant denied that the victim had called his house to talk to his wife, Brenda. Appellant also denied that he had taken the call and had a violent argument with Danny on the phone. He further denied that he, Brenda, and Danny were all on the phone at the same time at which

time they made threats to each other; that Danny told appellant where he was; and that he, the appellant, immediately left the house to go meet Danny while Brenda and Danny were still on the phone.

After appellant rested at trial, he filed a Motion in Limine asking that the state of Indiana be ordered to refrain from calling Brenda Teague. This was made for the reason that Brenda was the wife of appellant, and therefore would be privileged as to any testimony against him. Further, appellant asked that the state be prevented from calling one Jackie Peterson, who was the sister of Brenda. She would testify about a prior inconsistent statement made by Brenda, with reference to the phone call. Appellant argued that this would put the state in the position of impeaching its own witness.

The court overruled said Motion, and the state did call these two witnesses as rebuttal witnesses. Brenda Teague testified that she was asleep at the time her husband left the house and that she was not aware of his leaving. She testified that no phone call occurred involving herself, Danny and the appellant. She further testified that she had never made any previous statement to anyone that such events had occurred. Jackie Peterson testified that her sister, Brenda Teague, came to her house with the children during the night of August 16, and stayed with her for a period of about 10 days. She stated that Brenda did tell her about the three-way phone conversation and the circumstances under which appellant left the house. Jackie Peterson testified further that Brenda told her that appellant's attorney had advised them to try to keep such evidence out if possible. She said the attorney told them not to lie about anything, but further not to volunteer anything and to try to keep these incidents from going before the jury.

These witnesses were offered by the state in rebuttal to the evidence by the defense in its case-in-chief. Rebuttal

evidence is, as the name indicates, that which tends to explain or contradict or disprove evidence offered by the adverse party. The admissibility of rebuttal evidence is within the sound discretion of the trial court. *Taylor* v. *State,* (1973) 261 Ind. 251, 301 N.E.2d 633. Under the circumstances, Brenda Teague was a proper witness for the state to call in rebuttal to appellant's testimony with reference to the call made at appellant's home, and with reference to the fact that appellant in fact went to town to meet the victim, and had purposely turned into the alley to confront him.

Communications between a husband and wife are privileged under Ind. Code § 34-1-14-5 (6) (Burns 1973). Privileged communications between husband and wife, however, have been restricted in application to confidential communications and information gained by reason of the marital relationship. *Sheppard* v. *State,* (1971) 257 Ind. 229, 277 N.E.2d 165; *Smith* v. *State,* (1926) 198 Ind. 156, 152 N.E.2d 803. Brenda Teague's phone conversation in this cause does not fall within the privileged communications category. This conversation was initiated when a third person, the victim, called the home and talked to both husband and wife, and the conversation concerned the relationship of all three. It was therefore, not a confidential communication by the husband, here the appellant, to the wife. The trial court properly refused to exclude the testimony on that ground.

Furthermore, the state registered its surprise to the court that the witness, Brenda Teague, denied that such events had occurred, and was now on the stand making statements inconsistent with her former statements to them. The state was then allowed to cross examine Brenda Teague as a hostile witness. The state then subsequently called the witness' sister, Jackie Peterson, and was allowed by the court to impeach its witness Brenda Teague,

with reference to statements she had made about the telephone conversation. Ind. Code § 34-1-14-15 (Burns 1973), provides:

"The party producing a witness shall not be allowed to impeach his credit by evidence of bad character, unless it was indispensable that the party should produce him, or in case of manifest surprise, when the party shall have this right; but he may, in all cases, contradict him by other evidence, and by showing that he has made statements different from his present testimony."

In *White* v. *State*, (1967) 249 Ind. 105 at 109, 229 N.E.2d 652 at 654, this court provided:

"In a criminal prosecution where the testimony of a witness for the State is prejudicial to the prosecution on a proper showing of surprise, the State may show that the witness made statements to the contrary."

*See also Bell* v. *State*, (1977) 267 Ind. 1, 366 N.E.2d 1156 at 1159. The court did not abuse its discretion and properly permitted these two witnesses to testify as rebuttal witnesses for the state.

One Daniel Nance was also called as a rebuttal witness by the state, and testified that Carter's grocery store had ceased its twenty-four hour operations six months previous to the date of August 16, the night in question, and had been closing at midnight for all of this time. This, of course, was offered to rebut the testimony of appellant that he was going to this store to buy medicine for his sore throat, starting at 12:30 at night, when the store had already been closed for one half hour. Appellant stated that he did not know they had changed their hours, and that he thought that the store was still open twenty-four hours a day. These were questions of credibility for the jury. We cannot say that the trial court abused its discretion in allowing the state to present the testimony of Daniel Nance to rebut the defense offered by appellant.

## VIII.

Appellant next charges that the trial court erred in over-ruling appellant's objections to the state's proposed final

instructions Nos. 5, 6, 10, 15 and 17, which were subsequently given to the jury by the court. These objections are presented to us by capsule statements and conclusions by appellant. He has also failed to comply with Ind. R. Ap. P. 8.3(A)(7), in that he has not set out the instructions verbatim in his brief, nor has he set out wherein he made these objections in the record to the trial court prior to the giving of the instructions to the jury. Further, he has not set out when he raised these questions before the trial court in his Motion to Correct Errors. An examination of the record and transcript shows that the appellant did make some objection to some of these instructions to the court prior to their being given to the jury, but not to all of them. Also, different grounds of objection were given on some of the instructions which were not the same objections made before the court previously and in some instances different grounds are alleged here in review than were raised by the Motion to Correct Errors or in his objections to the court. Appellant has accordingly waived error on all of these instructions, as we find his non-compliance with the rules sufficiently substantial to impede our consideration of the issues raised. *Davis* v. *State,* (1976) 265 Ind. 476, 355 N.E.2d 836; *Ingol* v. *State,* (1973) 261 Ind. 329, 303 N.E.2d 49.

## IX.

Appellant contends the trial court erred in sustaining the state's objections to his tendered instructions Nos. 1, 6, 7, 9 and 10, and refusing to give said instructions. Appellant again fails to comply with Ind. R. Ap. P. 8.3(A)(7) in his presentation of these issues. However, we have examined the record and found that appellant's tendered instructions 1, 6, and 7 deal with the issue of self-defense. Such examination reveals that the court in fact gave five separate final instructions to the jury on the issue of self-defense, and that all issues of this defense were fully and

properly given to the jury. Appellant's tendered instructions were merely repetitious of those instructions given by the court, so the appellant was not prejudiced by the court's refusal to give them.

Appellant does not show in his brief what the tendered instructions 9 and 10 were, nor show that the issues he raises here were presented to the trial court in his Motion to Correct Errors. In fact, an examination of the Motion to Correct Errors shows that these issues were not raised at any time before the trial court. Furthermore, his argument does not discernably and cogently show how the court failed to properly instruct the jury by its refusal to give tendered instructions 9 and 10. *Cf. Bradberry* v. *State,* (1977) 266 Ind. 530, 364 N.E.2d 1183 at 1186. Appellant's argument seems to be that since the court directed the verdict as to first-degree murder at the close of the state's case, the court then improperly gave an instruction which told the jury that under an indictment of first-degree murder the defendant can be found guilty of second-degree murder, voluntary manslaughter, or involuntary manslaughter, or he may be found not guilty. Final instructions of the trial court then defined the elements of second-degree murder, voluntary manslaughter, and involuntary manslaughter. The court did not improperly refer to the first-degree murder indictment in these instructions. The jury had already been advised that they could not find appellant guilty of first-degree murder since the court had withdrawn that charge from them. These instructions explained to the jury that the remaining charges of second-degree murder, voluntary manslaughter, and involuntary manslaughter were still before them for their decision. The question of whether or not the court should have directed a verdict as to these remaining charges will be considered in issue XI, *infra,* of this opinion. We find no reversible error in the court's instructions to the jury or in the refusal of appellant's instructions.

## X.

The appellant next contends that the court should have found that the Indiana statute governing sentencing for second-degree murder, Ind. Code § 35-1-54-1 (Burns 1975), was unconstitutional in that second-degree murder is an included offense of first-degree murder and yet carries the same penalty of life imprisonment. Further, appellant argues that the jury was allowed to sentence him to life imprisonment without having first considered a pre-sentence commitment report. Both of these issues have been considered before by this court. We have found that a pre-sentence report is for the purpose of the trial judge in determining sentence of a defendant where alternative sentences are available. We have further found, however, that the jury is not required to consider a pre-sentence report when fixing or recommending a sentence. *Pulliam* v. *State,* (1976) 264 Ind. 381, 345 N.E.2d 229. A pre-sentence report was filed by the probation department here, and the court did consider it before pronouncing sentence on appellant. We have further held that a lesser included offense must not carry a greater penalty than the greater offense, but a lesser included crime may have a penalty as great as the greater crime. *Brown* v. *State,* (1974) 261 Ind. 619, 308 N.E.2d 699. There is no error presented here.

## XI.

The appellant next raises the question of the sufficiency of the evidence for conviction of second-degree murder. He raised the question by filing a Motion for a Directed Verdict at the close of the state's evidence, which was overruled by the court. He then filed a Motion for a Directed Verdict at the close of all the evidence, indicating the same grounds, and again raised the question in the Motion to Correct Errors.

It is appellant's contention that there is no evidence before the jury that the victim, Danny Haynes, died of bullet wounds inflicted by him. His argument is based on the fact that when

Chief Orbach came upon Danny lying on the sidewalk, and was told by him that "Butch Teague shot me," that the Chief could not see his back, and therefore could not say that there was a bullet wound in it. The argument is further supported by the argument that the statement given by Danny was inadmissible. We have since disposed of that argument in issue I, *supra*, of this opinion.

In addition to Chief Orbach's testimony and Danny's statement, however, the jury heard the testimony of witnesses Hemphill, Spearman, Slayton and Farr that appellant was seen shooting a rifle at the victim as he ran down the sidewalk. Dr. William McNalley testified that he came to Community Hospital in Anderson, Indiana, on August 16, 1975, and performed an autopsy on the remains of a person identified to him as Daniel Haynes. He further examined a photograph of Haynes' body, and stated that the person appearing therein, was the one on which he had performed the autopsy. Dr. McNalley removed a bullet from this body which was later proved by ballistics tests to have come from the rifle of appellant. The appellant further claims, however, that there was no evidence that proved that Danny Haynes' body was in fact taken from Dunnechay Funeral Home to the Community Hospital in Anderson, Indiana, and that Doctor McNalley did not identify Daniel Haynes by any other means except that someone told him this was Danny Haynes. These arguments go to the weight of the testimony rather than to the admissibility of it. No question was raised as to the identity of the body by Dr. McNalley at the time he testified. It is competent for a doctor to testify as to the identity of a body under circumstances presented by these facts, in the absence of some question being raised as to the accuracy of that identification. Any questions remaining at this point go to the weight of the evidence and the credibility to be attached to the doctor's testimony by the jury.

The issue is well settled that in resolving questions of sufficiency of the evidence to sustain a criminal conviction,

this court may neither weigh the evidence nor resolve the questions of credibility. Rather we consider only the evidence most favorable to the state together with all logical and reasonable inferences which may be drawn therefrom. If, from that viewpoint, we find substantial evidence of probative value from which the trier of fact could have reasonably inferred that the defendant was guilty beyond a reasonable doubt, the conviction may not be disturbed. *Barrett v. State,* (1975) 264 Ind. 73, 329 N.E.2d 58. Taking the evidence most favorable to the state here, there is ample evidence from which the jury could have found that the appellant did in fact purposely kill and murder Danny Haynes with a rifle, and that he did not do so in self-defense.

## XII.

The appellant finally raises the question of fundamental error. He cites five instances in which the trial court allegedly erred in preliminary and final instructions, but which were not objected to by appellant at trial. He states that the errors were so serious that they go to the very integrity of the trial, and are so prejudicial to his rights that he could not have had a fair trial. The errors he assigns in this category are set out in appellant's brief as follows:

"A. Preliminary Instruction No. 7 (R 149) instructed the Jury that the term Reasonable Doubt has no technical meaning in law.

B. Preliminary Instruction No. 8 (R 150) instructed the Jury concerning the fact that the defendant is not required to testify.

C. Preliminary Instruction No. 9 (R 151) instructed the Jury that it was the determiner of the law and the facts denying the Appellant equal protection of the law under the Federal and State Constitution.

D. Final Instruction No. 5 (R 190) instructed the Jury about a criminal conviction not contained in the record.

E. Final Instruction No. 6 (R 193) instructed the Jury regarding flight."

We have already discussed many of these issues in this opinion. The doctrine of fundamental error allows an appellate court to by-pass the normal rules of appellate [19, 20] procedure, such as the requirement of a timely and specific objection, when it appears that a reluctance to invoke the doctrine would amount to a blatant error that denies the appellant fundamental due process. *Webb* v. *State,* (1972) 259 Ind. 101, 284 N.E.2d 812; *Winston* v. *State,* (1975) 165 Ind. App. 369, 332 N.E.2d 229. We cannot say, under the facts of this case and the issues that have been discussed at length in this opinion, that these specifications represent such blatant error that this court is called upon to set aside its normal appellate procedure in reviewing them. We stated in *Hensley* v. *State,* (1969) 251 Ind. 633 at 639, 244 N.E.2d 225 at 228:

> "A party may not sit idly by and permit the court to act in a claimed erroneous manner and then attempt to take advantage of the alleged error at a later time. Objections must be made timely so that they may be promptly corrected by the trial court."

Appellant here was given ample opportunity to object to the instructions given by the trial court. In examining all of the instructions given herein we cannot say that they were so blatantly erroneous that appellant was denied due process.

The judgment of the trial court is affirmed.

Givan, C.J., Hunter, DeBruler, JJ. concur; Prentice, J. concurs in result.

NOTE.—Reported at 379 N.E.2d 418.