James CARLYLE, Appellant,

v.

STATE of Indiana, Appellee.

No. 1080S388.

Supreme Court of Indiana.

Nov. 19, 1981.

Gary R. Landau, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Dan La Rue, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-appellant James Carlyle was convicted of murder, Ind.Code § 35–42–1–1 (Burns Repl. 1979), at the conclusion of a jury trial in Vigo Circuit Court on March 31, 1980. The trial court sentenced Carlyle to forty (40) years in prison. His conviction and sentence is the subject of this appeal.

Appellant raises five issues for review, concerning: 1) whether the trial court erred in permitting the testimony of appellant's wife, Diana Carlyle; 2) whether the trial court erred in permitting improper cross-examination of the appellant; 3) whether the trial court erred in refusing appellant's request to poll the jury regarding media publicity; 4) whether improper hearsay was allowed in evidence; and 5) whether appellant was denied effective assistance of counsel.

The evidence most favorable to the State reveals that appellant lived with his family in a trailer adjacent to one owned by the victim, Jeffery Donnelly, in Rose Trailer Park, Rosedale, Indiana. On December 24, 1979, the Donnellys left home to open Christmas presents with other family members and returned home about 1:00 a. m., Christmas Day. They found that the front window of their trailer had been shot out and suspected the appellant of doing the shooting. Donnelly and appellant had had several arguments in the past but none had resulted in violence. After Donnelly noted the damage to his trailer, he went to the Carlyle trailer. He received no response after knocking on the door. Donnelly then left to get some plywood to board up his window. As he was getting in his car, the appellant and his wife came into the yard. The appellant raised the gun he was carrying and shot Donnelly, killing him. Mrs. Donnelly sought the help of a neighbor, Dayton Faris, who immediately went to the scene. Appellant told Faris, "It was an accident," and also said "I had to do it." Mrs. Donnelly and Mrs. Carlyle both testified that the appellant shot Donnelly; appellant himself told Deputy Sheriff Kevin Artz that he shot Donnelly.

## I.

Appellant testified in his own defense and said that his wife, Diana Carlyle, was the one who actually shot Donnelly as the appellant and Donnelly were talking. He said that Mrs. Donnelly and Mr. Faris lied in their accounts of the incident and that he originally took the blame for the shooting in order to protect his wife and children. Appellant said he changed his mind about taking the blame since he faced a possible life sentence.

On rebuttal, appellant's wife, Diana Carlyle, testified that she originally told the police that appellant's gun fired when Donnelly hit the gun. She stated that she told that story because Carlyle threatened her with bodily injury if she did not. Diana Carlyle explained that her husband had beaten her on many occasions and threat-ened her with "being six feet under" if she did not lie for him. She then testified that the appellant did, in fact, shoot Donnelly as the other witnesses said he had.

Appellant now contends that the testimony of Diana Carlyle was a privileged communication because of their marital relationship and the court committed error in permitting her to testify. The trial court overruled appellant's motion *in limine* directed to his wife's testimony and later overruled objection to her testimony by stating: "I think if the defendant here seeks to maintain that privilege I think he's lost his right to do so because he has himself shattered the marital image. I don't think he can invoke privilege to protect something which he has in effect destroyed it."

■ Communications between a husband and wife are privileged under Ind.Code § 34-1-14-5 (Burns Supp. 1981). Privileged communications between husband and wife, however, have been restricted in application to confidential communications and information gained by reason of the marital relationship. *Shepherd v. State*, (1971) 257 Ind. 229, 277 N.E.2d 165; *see also Teague v. State*, (1978) 269 Ind. 103, 379 N.E.2d 418. None of the testimony objected to here consisted of confidential communications or information gained by reason of the marital relationship. After Donnelly was shot, appellant told his wife to say "that Jeff swung and hit the gun and if you don't tell what I tell you I'll see you six feet under." Diana Carlyle told this version of the incident to the detectives because she was frightened of her husband. Her testimony was admissible because the disclosure was not made in reliance upon the marital relationship but because the defendant was in need of his wife's assistance and coerced her by force and fear. *See Beyerline v. State*, (1897) 147 Ind. 125, 45 N.E. 772.

## II.

Deputy Sheriff Artz testified that the appellant originally told him at the scene that, "I did the shooting," and after being read his *Miranda* rights continued to talk

about the incident. Then, after being in jail for sixty-nine (69) days, appellant gave a statement to detective Dohner that completely contradicted his initial statement. He then testified on the stand that his wife had, in fact, done the shooting. On cross-examination, the appellant was then asked by the prosecuting attorney why he remained silent for sixty-nine days before changing his statement. The appellant now cites *Doyle v. Ohio,* (1976) 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, for the proposition that it is reversible error to question a defendant about the use of his post-arrest silence granted under *Miranda v. Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

■ This argument is without merit for two reasons. First, appellant's objection at trial was that this matter was beyond the scope of direct examination. No mention was made at trial on the grounds appellant asserts before us on appeal. Therefore, the issue has been waived. *Norton v. State,* (1980) Ind., 408 N.E.2d 514, 525; *Bell v. State,* (1977) 267 Ind. 1, 6, 366 N.E.2d 1156, 1159. Second, even considering this issue on its merits, *Doyle, supra,* is not dispositive of the issue here. The appellant's voluntary explanation of his conduct made it clear that he was not relying on his Fifth Amendment rights to remain silent. We stated in *Nelson v. State,* (1980) Ind., 401 N.E.2d 666, as follows:

("In *Doyle,* the Court stated that *Miranda* warnings contain an implied assurance that a defendant's silence "will carry no penalty." 426 U.S. at 618, 96 S.Ct. at 2245, 49 L.Ed.2d at 98. The Court reasoned that silence following the *Miranda* warnings is "insolubly ambiguous" because it may constitute a reliance upon those rights rather than a tacit admission that he has an insufficient defense or explanation for his conduct. 426 U.S. at 617, 96 S.Ct. at 2244, 49 L.Ed.2d at 97. Thus, the Court held that impeachment use of Doyle's post-arrest silence violated the due process clause of the Fourteenth Amendment. We agreed in *Jones, supra,* and stated that "(the) use of an accused's

post arrest silence to impeach his trial testimony is fundamentally unfair." 265 Ind. at 450, 355 N.E.2d at 404.

There is however, a crucial distinction between those cases and the instant case. Jones remained silent after arrest and advisement of his rights. Doyle's silence was not absolute, but his statements to arresting officers were tantamount to silence: he merely inquired, "What's this all about." 426 U.S. at 615, note 5, 96 S.Ct. at 2243, 49 L.Ed.2d at 96. Charles, in the case before us, did not remain silent. Instead he elected to give an account, albeit brief, of his participation in the events.

Courts in other jurisdictions have addressed similar issues and have concluded that there is no *Doyle* violation where a defendant chooses to give police a selected account of an incident rather than clearly relying upon his Fifth Amendment rights.)

(citing cases): 401 N.E.2d at 668.

■ Appellant is not being penalized for his silence here. He was being questioned about two statements given 69 days apart which were totally inconsistent with each other. While a defendant may invoke his right to remain silent at any time, it does not follow that he may remain "selectively" silent and later claim that voids in the incomplete statement are sheltered by the Fifth Amendment and under *Doyle* cannot be used to impeach his testimony. *Nelson, supra.* The State properly points out there is nothing in the record to suggest that the appellant's failure to relate potentially exculpatory information was an exercise of his Fifth Amendment rights. Rather, the omission, in the context of his post-arrest explanations, was probative upon the question of whether the exculpatory testimony was a recent fabrication. *Nelson, supra.* There was no trial court error in allowing the State's questions in this regard.

### III.

■ The appellant asserts that the trial court prejudiced him by denying his request

to poll the jury following a week-end recess about media coverage of the trial. Appellant did not allege or show that there was any evidence of possibly prejudicial media accounts during the weekend nor did he make any motion for withdrawal of submission of the cause from the jury on the refusal of the court to poll the jury. Appellant's citation of *Liddle v. State*, (1973) 260 Ind. 548, 297 N.E.2d 801 does not support his proposition that "denial of a defense motion to poll the jury as to the extent of their knowledge of trial publicity has been held to be reversible error." This Court held in *Liddle, supra*, that it was error not to have polled the jury in relation to one newspaper article when that article contained information about the defendant considered inadmissible and a juror was seen to have a copy of the newspaper containing the article. Here there was no showing that there was any potential prejudicial media coverage that the jury might have seen that would justify the court in permitting the jury to be polled. The court accordingly did not abuse its discretion by refusing the request.

### IV.

■ In his case in chief, the appellant offered several witnesses that testified favorably about his character. They were called to testify as to his general reputation for truth and veracity. In rebuttal then, the State produced not only appellant's wife but two former wives and other witnesses who all testified as to acts of physical abuse committed by the appellant. One of these witnesses, the appellant's second wife, testified that the appellant beat her in the presence of her young daughter, three years of age. She was then asked the question: "What did your little girl say, ma'am?" and the answer: "She would cry, please don't hurt my mommy." It is appellant's contention that this testimony was highly prejudicial hearsay and that the trial court committed reversible error by allowing it.

The State contends that even if the evidence was improperly admitted, it was harmless error in view of the large amount of properly admitted evidence that indicated violent acts on the part of the appellant. Appellant's first wife, Sarah Petts, testified that the appellant beat her from four to six times a week during their short marriage and that he once hit her mother and kicked her eleven year old brother in the genitals. Cheryl Cooper, wife of the appellant's then best friend, testified that the appellant aimed a rifle at her and her baby and threatened them less than a month before the shooting; the appellant's second wife, Martha Carlyle, testified that he beat her frequently and on one occasion hit her repeatedly in the stomach while she was seven months pregnant, leaving her black and blue from her chest to her stomach. She further testified that the appellant put a knife to her throat, grabbed her around the throat, beat her in front of her young child while the child pleaded for him to stop, hit her hard enough to knock her down on several occasions and once kicked her in the face. There was also testimony, indicated earlier in this opinion, that appellant came on the property of the victim with a gun and shot him. Consequently, any error in the admission of this question and answer was harmless. We cannot say that this testimony was so prejudicial as to improperly influence the jury in its verdict nor can it be considered as anything more than cumulative of other undisputed and properly admitted evidence. *Jackson v. State*, (1980) Ind., 402 N.E.2d 947; *Ballard v. State*, (1974) 262 Ind. 482, 318 N.E.2d 798; *Chatman v. State*, (1975) 263 Ind. 531, 334 N.E.2d 673.

### V.

Finally, appellant contends that his representation by counsel was so ineffective as to be a mockery of justice.

■ Our consideration of this issue was well-stated in our recent decision in *Nelson, supra*, as follows:

"An attorney is presumed to have rendered competent representation, and only a strong showing to the contrary will rebut that presumption. *E. g., Robertson v. State*, (1974) 262 Ind. 562, 319 N.E.2d

833. We must look to the facts of each case in order to determine whether counsel has provided his client with effective representation. *E. g., Roberts v. State,* (1977) 266 Ind. 72, 360 N.E.2d 825. We will not second-guess counsel's trial tactics or strategy. *E. g., Loman v. State,* (1976) 265 Ind. 255, 354 N.E.2d 205. An isolated mistake or instance of poor strategy does not render representation ineffective or inadequate; and representation is deemed to be adequate, unless the record reflects that the trial was reduced to a mockery of justice. *E. g., Merida v. State,* (1979) Ind., 383 N.E.2d 1043."

401 N.E.2d at 669.

Appellant's allegation of ineffective assistance of counsel is mainly directed toward the introduction of appellant's character into the trial by the calling of witnesses to testify for his truth and veracity. The appellant claims this mistake was so grave as to hardly be called trial tactics and strategy. The record shows, however, that appellant's counsel did actively and diligently try this case. He was diligent in making objections during the trial and many times was successful in precluding the introduction of damaging testimony. Other motions were timely made that showed counsel's sincerity and diligence. Isolated poor strategy does not necessarily amount to ineffective assistance of counsel. This Court will not speculate as to what might have been the most advantageous strategy in a particular case; the mere fact that another attorney might have conducted the defense differently is not sufficient to require reversal. *Dull v. State,* (1978) 267 Ind. 549, 372 N.E.2d 171; *Blackburn v. State,* (1973) 260 Ind. 5, 291 N.E.2d 686. Representation of an attorney is deemed to be adequate unless the record reflects that the trial was reduced to a mockery of justice. There is no such reflection in this record.

The trial court is in all things affirmed.

All Justices concur.