Tommy James RUBALCADA,
Defendant–Appellant,

v.

STATE of Indiana, Plaintiff–Appellee.

No. 82S00–9902–CR–113.

Supreme Court of Indiana.

June 30, 2000.

Dennis A. Vowels, Evansville, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General, Janet Brown Mallett, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

DICKSON, Justice

The defendant-appellant, Tommy James Rubalcada, was convicted of conspiracy to

commit robbery[1] and felony murder[2] for the February 1998 death of Brian Jamison. On direct appeal, the defendant alleges the following errors: (1) his review of the police investigative file concerning the victim was restricted; (2) his wife was permitted to testify against him; (3) his cross-examination was limited; and (4) a prosecution witness received a plea bargain which was not disclosed at trial. We affirm.

### Review of Police Records

The defendant claims that he was denied his federal constitutional rights to due process, confrontation, and compulsory process when the trial court refused to order production of police intelligence records concerning the victim, Brian Jamison.[3] He argues that the denial of this information prevented him from learning of the self-interest and motivations of the State's witnesses, from preparing adequately to cross-examine and impeach these witnesses, and from developing alternate defense theories.

Prior to trial, the defendant issued four subpoenas duces tecum directing the Indiana State Police, the Warrick County Sheriff, the Evansville Police Department, and the Vanderburgh County Sheriff to provide the trial court with "all intelligence reports ... concerning Brian Jamison" for *in camera* inspection. Record at 132–39. The agencies produced fifty-five pages of intelligence reports and one audiotape, which the trial court individually reviewed *in camera* at a hearing attended by counsel for the defendant and the State. At the hearing, the court afforded the State an opportunity to describe each item and to present any objections and allowed defense counsel to argue for disclosure. The *in camera* review hearing resulted in the trial court ordering five of the pages disclosed to the defendant and concluding that the remaining fifty pages and the audiotape met the definition of criminal intelligence information under Indiana Code section 5–2–4–1[4] and that, under Indiana Code section 5–2–4–6,[5] they need not be disclosed. The trial court also concluded:

> [N]one of the information which has not been ordered to be disclosed has any apparent exculpatory benefit to the defendant and neither is any of that information relevant to any of the issues that have been raised in this case or any defenses that have been raised in this case. And until such time as those issues and defenses are presented to the Court that makes any of these documents or information relevant, the Court will order that they not be produced.

Record at 167.

■ We consider together the defendant's claimed violations of his rights to

---

1. IND.CODE §§ 35–41–5–2 & 35–42–5–1.

2. IND.CODE § 35–42–1–1.

3. The defendant also claims he was denied similar rights under the Indiana Constitution. Although the defendant cites relevant clauses of the Indiana Constitution, he provides no separate and independent argument for these claims. Accordingly, we consider these claims on the basis of federal constitutional doctrine and express no opinion as to what, if any, differences there may be under the Indiana Constitution. *Williams v. State,* 690 N.E.2d 162, 167 (Ind.1997); *Matheney v. State,* 688 N.E.2d 883, 906 n. 29 (Ind.1997); *Tobias v. State,* 666 N.E.2d 68, 72 n. 1 (Ind. 1996).

4. The statute provides, in part:

"Criminal intelligence information" means information on identifiable individuals compiled in an effort to anticipate, prevent or monitor possible criminal activity. "Criminal intelligence information" does not include criminal investigative information which is information on identifiable individuals compiled in the course of the investigation of specific criminal acts.
IND.CODE § 5–2–4–1(b).

5. The statute provides:

Criminal intelligence information is hereby declared confidential and may be disseminated only to another criminal justice agency, and only if the agency making the dissemination is satisfied that the need to know and intended uses of the information are reasonable and that the confidentiality of the information will be maintained.
IND.CODE § 5–2–4–6.

due process and compulsory process. Claims such as those raised by the defendant here have traditionally been evaluated by the U.S. Supreme Court under the broader protections of the Due Process Clause of the Fourteenth Amendment. *Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40, 57 (1987). The compulsory process clause provides no greater protections than those afforded by due process, and a due process analysis is appropriate for determining whether compulsory process rights have been violated. *Id.*

■ It is well settled that the Due Process Clause requires the government to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. *Id.* at 57, 107 S.Ct. at 1001, 94 L.Ed.2d at 57 (citing *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215, 218 (1963). The same analysis applies to both exculpatory and impeachment evidence. *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490, 505 (1995). Evidence is material only " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* at 433–34, 115 S.Ct. at 1565, 131 L.Ed.2d at 505 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985) (opinion of Blackmun, J.); *id.* at 685, 105 S.Ct. at 3385, 87 L.Ed.2d at 496 (White, J., concurring in part and concurring in judgment)).

■ In *Ritchie*, the U.S. Supreme Court reversed that portion of the Pennsylvania Supreme Court's decision that would have allowed defense counsel to examine all of the government's confidential information. Instead, the Court in *Ritchie* remanded to the trial court for *in camera* review of the government's information to determine whether the evidence at issue was favorable to the defendant and material to either guilt or punishment. *Id.*, 480 U.S. at 60–61, 107 S.Ct. at 1002–03, 94 L.Ed.2d at 59–60. A defendant's right to discover exculpatory evidence, however, does not include the authority to search through the government's files unsupervised. *Id.* at 59, 107 S.Ct. at 1002, 94 L.Ed.2d at 58. The *Ritchie* Court required that the government files be submitted to the trial court, which "would be obligated to release information material to the fairness of the trial." *Id.* at 60, 107 S.Ct. at 1003, 94 L.Ed.2d at 59. The Court held that the defendant was entitled to have the government file "reviewed by the trial court to determine whether it contains information that probably would have changed the outcome of his trial." *Id.* at 58, 107 S.Ct. at 1002, 94 L.Ed.2d at 58.

In contrast to *Ritchie*, the trial court in this case did conduct an *in camera* review prior to trial and determined that the intelligence matters the defendant sought were not relevant to the issues presented in the case and did not have "any apparent exculpatory benefit to the defendant." Record at 167.

■ We review the trial court's ruling, based on its *in camera* inspection of government investigative materials, for an abuse of discretion in denying access to material, exculpatory, or impeachment evidence. *See Pilarski v. State*, 635 N.E.2d 166, 172 (Ind.1994); *United States v. Plescia*, 48 F.3d 1452, 1457 (7th Cir.1995). As noted by the Seventh Circuit Court of Appeals, when a criminal defendant seeks access to confidential government files, appellate courts "rely particularly heavily on the sound discretion of the trial judge to protect the rights of the accused as well as the government." *Plescia*, 48 F.3d at 1457 (quoting *United States v. Phillips*, 854 F.2d 273, 277 (7th Cir.1988)).

Because the trial court's determination in denying access to some of the subpoenaed matters referred only to relevance and exculpatory value, but did not expressly refer to impeachment value or materiality, we draw upon the methodology used by

the Supreme Court in *Kyles* in our review of the claim presented. The Court in *Kyles*, noting that the federal Constitution "is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense," *Kyles*, 514 U.S. at 436–37, 115 S.Ct. at 1567, 131 L.Ed.2d at 507, stressed that materiality under *Bagley* requires that suppressed government evidence be "considered collectively, not item by item." *Id.* at 436, 115 S.Ct. at 1567, 131 L.Ed.2d at 507. The Court then explained that it first evaluates the "tendency and force" of the undisclosed evidence item by item and thereafter, for purposes of materiality, considers the cumulative effect separately. *Id.* at 436 n. 10, 115 S.Ct. at 1567 n. 10, 131 L.Ed.2d at 507 n. 10. We will, therefore, evaluate the tendency and force of the defendant's specific individual challenges made in this appeal and then consider the cumulative effect to determine materiality collectively. To prevail, the defendant must demonstrate "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. at 1566, 131 L.Ed.2d at 506.

The defendant contends that the trial court erred in not ordering the State to produce to the defendant pages 2–5, 10, 11, 13, 14, 16, 17, 24, 26, 32, and 52 of the subpoenaed materials.[6] With regard to pages 2–5, the defendant claims that these pages contain the names of a number of individuals—specifically, David Harris, who provided Jamison the purchase money for the transaction but was not available for deposition by the defendant based upon a successful motion to quash the subpoena; and Aundre Reese, Vince Moreno, Thomas Pryor, Tammie Thorton, and Brett McBride, all of whom testified at trial for the State. On pages 2 and 3 of the undisclosed pages, these names are listed among "subjects linked [to Jamison] via intelligence." Record at 173–74. The list suggests only that the police had observed these individuals in contact with Jamison. The defendant was aware of the relationships among Jamison and these people, and there was no dispute at trial that these people had contact with Jamison or that Jamison was engaged in drug trafficking.

The defendant next claims that page 10 would have provided evidence that might be used to argue that someone else had a motive to kill Jamison. Page 10 is a criminal intelligence report filed four years before the murder that indicates that an anonymous person reported that Jamison sold marijuana to a 12–year–old boy and had many visitors at his house in the evening. The report says that the reliability of the source and the validity of the information are both unknown. There was no dispute that Jamison engaged in drug trafficking. The potential evidentiary value of this anonymous report about his possible actions four years before his death is minimal.

Page 11 is an unsigned document, dated February 28, 1997, indicating that a person, identified only by a first name, reported that a runner for Jamison was arrested in St. Louis and that, when the runner arrived at the meeting point, Jamison saw police cars hiding nearby and left. The report also notes that the source had given accurate information that George Cobb was arrested in Texas with Jamison. The report does not indicate who received the information or what agency was involved. The defendant claims that his counsel alluded to this information on cross-examination of Aundre Reese. A review of the record shows that counsel asked Reese if he had ever been arrested in St. Louis and Reese denied ever having been in Mis-

---

6. Although the trial court ordered that all the reviewed information be permanently sealed in the court's file, Record at 168, the Clerk of the Vanderburgh Circuit Court, upon request by the defendant at the commencement of this appeal, included these documents and materials in the record on appeal. Record at 172–227.

souri.[7] The defendant also notes that page 20 of the undisclosed materials provides Cobb's name and address and indicates he is an associate of Jamison. The relevance and weight of the information on pages 11 and 20 are minimal.

The defendant next asserts errors regarding pages 13 and 14. The handwritten note on page 13 indicates that "all of these subjects were at [Jamison's] apartment last night," record at 184; however, because it is undated, it is unclear when that might have been. The note also says that Jamison was pulled over at a traffic stop and a search of the car revealed nothing. It then states that William Simmons was arrested on an outstanding warrant and that Simmons and Jason York were suspected in an armed robbery that may have occurred "over drugs." Record at 184. Page 14 contains photographs of Simmons. Although York testified at trial under a grant of use immunity, we see nothing substantive in this note with which the defendant might have impeached York or refuted the Deputy Prosecutor's assertion that York had committed no crime. Suspicion of involvement in a robbery does not establish the fact of conviction for use as impeachment. The defendant argues that page 52 ties in with this evidence because it contains a response to an inquiry for a vehicle registration from the Bureau of Motor Vehicles for a car found to be registered to Simmons that was observed parked in a location that the defendant says was near Jamison's residence. The evidentiary value of this information is tenuous at best.

The defendant asserts that pages 16 and 17 identify a person who kept two pistol grip shotguns because he was afraid of Jamison and also provide names of other associates of Jamison. These pages are dated February 28, 1997, and present a summary of information provided when the police signed a confidential informant. The defendant asserts that this evidence would have been admissible to show that someone else had a motive to kill Jamison. The defendant makes no showing that any of these individuals are linked to this case. Mere speculation that others may have had a motive to kill Jamison lacks probative value and weight.

The defendant asserts that page 24 would have been admissible because it showed that someone else may have had reason to want Jamison dead. On this page, dated October 23, 1997, the officer states that the informant showed them a residence in Henderson, Kentucky, that was presumed to be Jamison's and stated that Jamison was still involved in transporting large quantities of marijuana and that one of Jamison's associates had been arrested while carrying several pounds of Jamison's drugs. Again, the mere possibility of motive, without more, is of little evidentiary value.

The defendant asserts that page 26 "discloses another of ... Jamison's drug sale transactions," Brief of Defendant–Appellant at 16; however, nothing on this page suggests a transaction, but rather lists a phone number, Jamison's name, and says: "another big dealer living in behind Schnucks ... lives across from the St Police," record at 197. It is unclear if this refers to Jamison as another big dealer or someone else. The defendant asserts that page 32[8] notes the arrest of Jamison and Cobb in El Paso, Texas, on January 21, 1997, and an arrest of an unnamed male carrying marijuana belonging to Jamison in St. Louis at the end of 1996. There is little of substance to this information.

In response to the defendant's claims, the State argues that the undisclosed ma-

---

7. In light of the trial court's order sealing these documents, we assume from the defendant's argument that, at least with regard to this information, he was able to obtain information about the victim and his associates from other sources.

8. The defendant makes the same allegation regarding page 26; however, we find no reference to any of this information on page 26 and assume it was a typographical error.

terial could not have placed the defendant's case in a different light and that none of the undisclosed information shows that another person could have committed the crime. It further argues that the evidence at trial established that Jamison was a marijuana dealer and that most of the State's witnesses associated with him also were involved in illegal drug activity. The State urges that the challenged intelligence material "merely shows that Jamison was a drug dealer who may have had enemies, a fact both the State and the defense adduced at trial." Brief of Appellee at 5.

■ Although the undisclosed pages identified and challenged by the defendant were individually of minimal probative value and weight, we must consider them cumulatively to determine whether this information would have met the materiality requirement. In other words, we determine whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles,* 514 U.S. at 433–34, 115 S.Ct. at 1565, 131 L.Ed.2d at 505. Considered cumulatively, we see little probability that disclosure would have led to a different result. The evidence at trial established that Jamison was a marijuana dealer and that most of the State's witnesses associated with him were also involved in illegal drug activity. We conclude that the suppressed police intelligence pages did not contain information that could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. We find there is no reasonable probability that the outcome would have been different if this information had been disclosed, and we find no violation of the defendant's due process or compulsory process rights in the trial court's determination.

■ The defendant also claims that he was denied the right to confrontation because of this undisclosed information. A criminal defendant shows a violation of the Confrontation Clause by establishing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby from showing the jury facts from which it could appropriately draw inferences relating to the witness's reliability. *Delaware v. VanArsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674, 684 (1986); *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347, 355 (1974). The Confrontation Clause, however, is not a constitutionally compelled rule of pretrial discovery. *Ritchie,* 480 U.S. at 52, 107 S.Ct. at 999, 94 L.Ed.2d at 54. It only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.,* 480 U.S. at 53, 107 S.Ct. at 999, 94 L.Ed.2d at 55 (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15, 19 (1985)) (emphasis in original). *See also VanArsdall,* 475 U.S. at 679, 106 S.Ct. at 1435, 89 L.Ed.2d at 683.

■ The record is clear that Jamison was involved in illegal drug transactions and that many of the State's witnesses' relationships with Jamison centered on these illegal drug transactions. In fact, the State presented much of this evidence. Thus, we understand the defendant's claim to be that, because he was denied information that these witnesses were being investigated by police agencies, he was denied the opportunity to show the witnesses' bias or motivation to testify. We disagree. The defendant's cross-examination was not limited because he lacked this information, and he was able to adequately address the relationship between the witnesses and Jamison, including their involvement in illegal drug transactions. The defendant has not met his burden of showing that he was denied an opportunity to conduct otherwise appropriate cross-examination. We find no violation of his right to confrontation.

### Spousal Privilege

 The defendant claims that the trial court erred in allowing his wife to testify regarding privileged marital communications and that the prejudicial impact of this testimony outweighed its probative value. Communications between a husband and wife are privileged pursuant to statute,[9] but the privilege is restricted to confidential communications and information gained by reason of the marital relationship. *Carlyle v. State,* 428 N.E.2d 10, 12 (Ind.1981). The defendant claims the following testimony constituted privileged information and should not have been admitted:

> State: Did there come a point, Mrs. Rubalcada, where your husband threatened you with harm if you ever told anyone the things you heard?
>
> Witness: Yes he did.
>
> State: What did he say?
>
> Witness: Uh, he just said things like that he'd kill me, but he always said like, "I'll kill you and then I'll kill myself." Or he'd tell me things like he'd hurt whatever I loved the most.

Record at 873.

Not every communication between spouses is protected by virtue of the marital relationship; "[o]nly those communications passing from one marriage partner to the other because of the confidence resulting from their intimate marriage relationship receive such protection." *Rode v. State,* 524 N.E.2d 797, 799 (Ind.Ct.App. 1988). As this Court explained over one hundred years ago, "if what is said or done by either has no relation to their mutual trust and confidence as husband and wife, then the reason for secrecy ceases." *Beyerline v. State,* 147 Ind. 125, 130, 45 N.E. 772, 774 (1897), *quoted in Rode,* 524

N.E.2d at 799. The communication that the defendant claims to be privileged was a threat to do violence to her if she disclosed what she knew of his criminal actions. Such communications do not enhance the mutual trust and confidence of the marital relationship that the privilege is intended to protect. *See Carlyle,* 428 N.E.2d at 12 (no privilege for the defendant's threats to kill wife if she did not corroborate his description of murder); *Van Donk v. State,* 676 N.E.2d 349, 351 (Ind.Ct.App. 1997) (where husband injured wife, her testimony regarding the infliction of these injuries was admissible because disclosure not made in reliance upon the marital relationship). The defendant's threats were not privileged communications.

 The defendant further contends that his wife's testimony should have been excluded because its prejudicial impact outweighed its probative value. Ind. Evidence Rule 403. Such matters are within the sound discretion of the trial court. We find no abuse of discretion.

We find that the trial court did not err in permitting the defendant's wife to testify that the defendant threatened to kill her if she disclosed details of his criminal activities.

### Handgun Evidence

 The defendant claims the trial court erred in refusing to admit testimony regarding how Vincent Moreno, the defendant's accomplice, obtained the murder weapon. Prior to Moreno's testimony, the State filed a motion in limine to prohibit evidence that Moreno obtained the gun by robbing a drug dealer and argued that Moreno was not arrested, charged, or convicted of that robbery. The defendant argued that the testimony should be admitted because the gun was stolen during the

---

**9.** The parties both cite Indiana Code section 34-1-14-5, which provided: "Except as otherwise provided by statute, the following persons shall not be competent witnesses: ... Husband and wife, as to communications made to each other." By the time of trial, the statute had been replaced with the following

language: "Except as otherwise provided by statute, the following persons shall not be required to testify regarding the following communications: ... Husband and wife, as to communications made to each other." IND.CODE § 34-46-3-1 (1998). Our resolution of the issue applies equally to both provisions.

commission of a robbery and that this offense could be used for impeachment if Moreno had been convicted. The trial court rejected the defendant's argument, finding that the uncharged offenses were not appropriate for impeachment purposes under the Indiana Evidence Rules and that the source of the gun was not relevant to any issue in this case.

On direct examination, Moreno testified that he and Roy Nunez, the third accomplice in this case, had previously sold drugs and robbed drug dealers together. He also testified that Nunez stole the gun during a robbery in Fort Wayne and gave it to Moreno, who brought the gun from Fort Wayne with him. The defendant contends that he should have also been permitted to show that Moreno obtained the murder weapon during the robbery of a Fort Wayne drug dealer.

The trial court has inherent discretionary power on the admission of evidence, and its decisions are reviewed only for an abuse of that discretion. *Brewer v. State,* 562 N.E.2d 22, 25 (Ind.1990); *Oglesby v. State,* 515 N.E.2d 1082, 1085 (Ind.1987). The trial court did not abuse its discretion in determining that the additional testimony regarding the origin of the murder weapon was not relevant.

### Witness's Plea Agreement

The defendant next claims that he was denied the opportunity for meaningful cross-examination because Vincent Moreno eventually only received a 35–year sentence under a plea agreement rather than the 45–year sentence he testified had been offered to him in exchange for a guilty plea and his cooperation in testifying against his accomplices. The defendant claims that the jury was unable to properly weigh Moreno's motivation to testify because of this information.

On direct examination, Moreno acknowledged that the State had offered him a sentence of forty-five years if he pled guilty to murder. The State also asked him how much credit he might receive for "good time," which he acknowledged would bring his sentence to twenty-two and a half years. Moreno, however, also stated that he had not accepted the offer. On cross-examination, defense counsel reviewed the sentences Moreno might receive if he accepted the plea agreement:

Defense Counsel: The Deputy Prosecutor who was just asking you questions has conveyed a plea offer, a deal to you ... where on the murder count charged against you, you know you could get ... do you know what the minimum and maximum sentence for murder is?

Witness: No sir, I don't.

Defense Counsel: You can get upwards of sixty-five years in prison in Indiana, you know that, don't you?

Witness: Yes.

Defense Counsel: And did the government file a request to put you in prison for life with the possibility of no parole?

Witness: No sir....

Defense Counsel: Now, you've got what is known as two A felonies charged ... on this too, haven't you?

Witness: Yes sir.

Defense Counsel: Right, and what are they?

Witness: Robbery and conspiracy to commit robbery.

Defense Counsel: All right, and you know the minimum sentence you can get for that is twenty years and the maximum you can get for that is fifty years, don't you?

Witness: Yes sir.

Defense Counsel: Okay, and the offer ... you can get a forty-five year prison term if you accept the offer for the murder count, do you agree?

Witness: Yes sir.

Defense Counsel: And then on the A felony what's offered to you is a concurrent sentence. In other words, you plead guilty to those two A felonies, whatever the court gives you would run

at the same time as the sentence for murder, wouldn't it?

Witness: I don't ... I don't know.

Defense Counsel: Well, that's the offer from the government, so your sentences for an A felony would run at the same time, so you would be serving those at the same time that you serve your forty-five year prison term for murder, do you understand that?

Witness: Yes sir.

Record at 801–03. More than four months after the trial in this case, Moreno entered a plea agreement under which he pled guilty to count I, conspiracy to commit robbery, and was sentenced to twenty years, and under which he pled guilty to count II, robbery, and was sentenced to thirty-five years to be served concurrently with the sentence for count I. The State dismissed count III, murder.

 A prosecutor must disclose to the jury any agreement made with a witness and any promises, grants of immunity, or rewards offered in return for testimony. *Lott v. State,* 690 N.E.2d 204, 211 (Ind.1997); *McBroom v. State,* 530 N.E.2d 725, 729 (Ind.1988). As the U.S. Supreme Court has observed, " '[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.' " *Wright v. State,* 690 N.E.2d 1098, 1113 (Ind.1997) (quoting *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959)). The prosecutor's duty of disclosure arises when there is a confirmed promise of leniency in exchange for testimony, but preliminary discussions are not subject to mandatory disclosure. *Wright,* 690 N.E.2d at 1113; *Lopez v. State,* 527 N.E.2d 1119, 1129 (Ind.1988); *Aubrey v. State,* 478 N.E.2d 70, 74 (Ind.1985). When a witness hopes for leniency in exchange for his testimony and the State neither confirms nor denies that hope, there is no concrete agreement requiring disclosure. *McCord v. State,* 622 N.E.2d 504, 509 (Ind.1993). The witness's expectations, coupled with evidence of a deal after the in-court testimony of the witness, are insufficient to require that a disclosure be made. *Id.; Abbott v. State,* 535 N.E.2d 1169, 1172 (Ind.1989).

■ The State fully disclosed the terms of the agreement offered to the witness before his testimony: a sentence of forty-five years for a guilty plea on the murder charge. The witness testified that he had not accepted that offer. At the time of trial, no concrete agreement existed between Moreno and the State. Although Moreno may have hoped for the more lenient terms ultimately received, there is no indication that the State confirmed his hope that a lesser term might be offered after he testified. The defendant has not met his burden of showing that the State did not disclose its agreement with Moreno.

### Conclusion

The defendant's convictions are affirmed.

SHEPARD, C.J., and SULLIVAN, BOEHM, and RUCKER, JJ., concur.