## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 25 2018, 10:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Cory Lee Woody,

*Appellant-Defendant*,

v.

State of Indiana

*Appellee-Plaintiff*.

May 25, 2018

Court of Appeals Case No.
49A02-1710-CR-2423

Appeal from the Marion Superior Court

The Honorable Lisa F. Borges, Judge

Trial Court Cause No.
49G04-1607-MR-28708

**Brown, Judge.**

[1] Cory Lee Woody appeals his convictions for murder and robbery as a level 5 felony. Woody raises two issues which we revise and restate as:

> I. Whether the admission of certain testimony resulted in fundamental error; and
>
> II. Whether the evidence is sufficient to sustain his convictions.

We affirm.

## Facts and Procedural History

[2] Woody previously worked in the same building as Joshua Thomas and his wife Ashley Thomas, and Woody purchased drugs from Joshua. Joshua sold drugs, namely heroin, and used a particular phone for that purpose. He also drove a burgundy Chevy Tahoe and carried a gun. Woody lived with girlfriend Lula Dawson and drove a gold Ford Taurus which had a paper plate and was registered in the name of Dawson.

[3] At some point on September 25, 2015, Joshua told Ashley that he was leaving to make a drug transaction, left home, and later returned. Later that evening, Joshua told Ashley that he had to meet Woody, and at around 11:00 p.m., he told Ashley that he would be right back and left the house. Also on September 25, 2015, Woody was at his residence with Dawson, her son, and Woody's long-time friend Ned Casteel. At about 11:00 p.m., Woody asked Casteel to take a ride with him. Woody drove his gold Taurus and took a cell phone with him which was registered to Dawson. Woody traveled to an area near 42nd Street, noted a red Tahoe, and told Casteel "[t]here he is." Transcript Volume

II at 40. Woody opened the door of his vehicle and told Casteel, "[w]hatever you do, don't get out of the car." *Id*. Woody walked up to the window of the Tahoe, returned to his Taurus, and told Casteel "this wasn't a good spot" and that they were going to follow the Tahoe up the road. *Id*. at 41. Before they left, Woody realized that he had lost his phone, had the person in the Tahoe call his phone so he could locate it, and located his phone on the ground outside of the Taurus.

[4]   Woody followed the Tahoe onto Crestview Avenue and parked about fifteen feet behind the Tahoe. Woody opened the door of his car, leaned down and looked at Casteel and said "no matter what, do not get out of the car" and that he would be right back, and then walked up to the passenger side of the Tahoe. *Id*. at 42. The next thing Casteel observed was: "Pop. A flash." *Id*. Casteel saw a "tussling action" and that Woody was in the Tahoe. *Id*. at 43. Woody then ran back to the driver's door of the Taurus, and Casteel saw that he was soaked in blood. When Woody entered his vehicle, he had a necklace, heroin, Joshua's cell phone, a shell casing, and two guns, one of which was his own and the other was Joshua's. Casteel said "[m]an, what did you do," and Woody replied, "I robbed that n-----." *Id*. at 45. Woody told Casteel that Joshua did not have any money and had only the heroin, a necklace, and the gun. Woody said "[m]an, ain't nobody going to miss that n-----." *Id.* Woody and Casteel returned to Woody's residence, Casteel heard Woody tell Dawson that "[h]e had to kill the n-----," and Woody started to clean off his shoes and

took a shower. *Id*. at 47. Woody said there was nothing to worry about, no one had seen anything, and he had taken the shell casing.

[5] Indianapolis Metropolitan Police Officer Darrell Miller was dispatched to Crestview Avenue in response to a report of a suspicious vehicle identified as a red SUV. Officer Miller arrived at the location within two or three minutes, approached the Chevy Tahoe, discovered Joshua in the driver's seat, and requested a medic. Medics arrived and confirmed that Joshua was deceased. He had sustained a single gunshot wound with two skin defects, and the bullet had entered the right side of his forehead and exited on the left side of his head. Police discovered a fired bullet on the floorboard of the Tahoe near the driver's seat.

[6] When Joshua did not return home by close to midnight, Ashley called his phone a number of times but he did not answer. The second time she called Joshua's phone, there "was like a rustling noise" like the call had been answered, and then she heard the call hang up. *Id*. at 117. Joshua's phone rang in Woody's vehicle, and Woody told Casteel that he had taken Joshua's phone. Ashley left home to look for Joshua, eventually found his Tahoe and police vehicles near it, and was later informed that he had been killed. Ashley gave a statement to a detective and said that Woody should be investigated. On October 17, 2015, police came into contact with Woody and Casteel, and Woody was in possession of a nine-millimeter pistol.

[7]     The State charged Woody with Count I, murder; Count II, felony murder; and Count III, robbery resulting in serious bodily injury as a level 2 felony. At trial on August 28 and 29, 2017, the State presented the testimony of, among others, Casteel, Ashley, several police investigators, and witnesses who lived on the block where the shooting and robbery occurred. Casteel testified that, several weeks after the shooting and robbery, he had some involvement with the police and provided them with information in the hopes of receiving a deal in that case. When asked if he was given a deal in exchange for his testimony in this case, he testified: "Not even a consideration. It wasn't even took it into factor. Nothing." *Id*. at 49. On cross-examination, Casteel agreed that, when he said he did not receive a deal from the State, he was referring to a case in another courtroom. He indicated that he was present at the sentencing hearing in that other case and that his attorney had raised the fact that he was cooperating in this case. When asked "your hope in so doing was that the judge would show you leniency based on that; is that right," Casteel answered "[y]es, but they wouldn't accept it. They said, the State said there was no consideration to be – that was it." *Id*. at 61. When asked "[y]ou're saying that the State never . . . made you a promise that you were going to get a deal; right," he replied "[n]ever," and when asked "at your sentencing hearing, you did bring up the fact that you were cooperating in another case as a mitigating circumstance; your attorney did," Casteel answered "[t]he words wasn't cooperating. The word was testifying." *Id*. On redirect examination, Casteel indicated that he had reached out to a detective and asked to speak to him and that the detective had told him that he was not going to be charged with anything. At one point,

the prosecutor asked Casteel about Woody's demeanor after Woody returned to the Taurus following the shooting, and Casteel replied, "[h]e looked at me, man, like it was, it was like, he went and bought a loaf of bread. He looks at me and says, 'man, you ain't never done that before?'," and Woody did not object. *Id.* at 45.

[8]     Dorothy Kouroupis testified that, on September 25, 2015, she lived on Crestview Avenue, heard a popping sound, immediately jumped to her feet and looked out the window, and observed two vehicles parked in front of her house. She testified "[o]ne was a Chevy Blazer," and when asked "when you say Chevy Blazer, what type of vehicle," she said "[i]t was an SUV" and "I just specifically recall that SUV." *Id.* at 85. She testified the vehicle parked behind the SUV was a tan sedan, there were two people in the sedan, the tan sedan slowly backed up into a neighbor's driveway without its lights on, and she called the police. Marquetta Johnson testified that, on September 25, 2015, she lived on Crestview Avenue and observed a dark red or burgundy Tahoe driving slowly with a tan Taurus that had a paper plate following right behind it and that two people were in the tan car. She testified that she observed someone exit the tan car, that she saw a male figure stand outside the Tahoe, that she heard a gunshot and fell to the floor, and that the tan car backed up into a driveway of a neighbor with its lights off and then pulled away with its lights on. Richard Amberger, a forensic scientist with the Indianapolis Marion County Crime Lab, testified that he examined the bullet recovered from the floorboard of Joshua's Tahoe and the firearm later recovered from Woody and

determined that the bullet had been fired from Woody's firearm. The State also presented evidence regarding phone calls between Joshua's cell phone and the cell phone registered to Dawson and the general locations of the phone registered to Dawson on the night of September 25, 2015. The phone records show a call between the phones at 11:01 p.m. associated with one cell tower and additional calls between the phones at 11:34, 11:35, and 11:36 p.m. associated with another cell tower showing that the phone registered to Dawson was used in the general area of the murder on Crestview Avenue.

[9] The jury found Woody guilty as charged. The trial court, due to double jeopardy concerns, vacated the count for felony murder and entered the conviction for robbery as a level 5 felony. The court sentenced Woody to consecutive terms of sixty years for the murder conviction and five years for the robbery conviction.

## Discussion

### I.

[10] The first issue is whether the admission of certain testimony resulted in fundamental error. Specifically, Woody asserts the admission of certain testimony elicited from Casteel violated Ind. Evidence Rule 404(b). Generally, we review the trial court's ruling on the admission of evidence for an abuse of discretion. *Whatley v. State*, 908 N.E.2d 276, 280 (Ind. Ct. App. 2009), *trans. denied*. Woody failed to object to the admission of the testimony at issue here. Failure to object to the admission of evidence at trial normally results in waiver

and precludes appellate review unless its admission constitutes fundamental error. *Id.* (citing *Cutter v. State*, 725 N.E.2d 401, 406 (Ind. 2000), *reh'g denied*). Woody argues that the admission of the testimony was fundamental error. To rise to the level of fundamental error, an error "must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process." *Id.* (citing *Maul v. State*, 731 N.E.2d 438, 440 (Ind. 2000) (citations omitted)). The standard for fundamental error is whether the error was so prejudicial to the rights of the defendant that a fair trial was impossible. *Id.* (citing *Boatright v. State,* 759 N.E.2d 1038, 1042 (Ind. 2001)).

[11] On appeal, Woody asserts that Casteel's testimony that, after returning to the Taurus, Woody asked "man, you ain't never done that before," violated Ind. Evidence 404(b) and "implied that Woody admitted to committing murder in the past." Appellant's Brief at 20. He argues he was prejudiced by this testimony. The State responds that the prosecutor did not intend to elicit any statements from Casteel about any potential prior crimes but rather wished to elicit testimony about Woody's careless and callous attitude toward the victim and the crimes he had just committed which is not forbidden by Ind. Evidence Rule 404(b). It also argues that no substantial harm to Woody resulted and that the challenged statement was one single sentence during a two-day jury trial.

[12] Ind. Evidence Rule 404(b) provides:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a

person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

[13] Ind. Evidence Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

[14] The standard for assessing the admissibility of Rule 404(b) evidence is: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Whatley*, 908 N.E.2d at 281 (citing *Boone v. State*, 728 N.E.2d 135, 137-138 (Ind. 2000), *reh'g denied*; *Hicks v. State*, 690 N.E.2d 215, 221 (Ind. 1997)). The evidence is inadmissible when the State offers it only to produce the "forbidden inference" that the defendant has engaged in other, uncharged misconduct and the charged conduct was in conformity with the uncharged misconduct. *Id.* (citing *Crain v. State,* 736 N.E.2d 1223, 1235 (Ind. 2000)). The trial court has wide latitude, however, in weighing the probative value of the evidence against the possible prejudice of its admission. *Id.* If evidence has some purpose besides behavior in conformity

with a character trait and the balancing test is favorable, the trial court can elect to admit the evidence. *Id*. (citing *Boone*, 728 N.E.2d at 138). For instance, evidence which is necessary for the jury to understand the relationships between the victim, various witnesses, and the defendant may be admissible. *Id*. (citing *Wilson v. State*, 765 N.E.2d 1265, 1270-1271 (Ind. 2002)).

[15] At trial, the prosecutor elicited testimony from Casteel regarding the interaction between Casteel and Woody after Woody returned to the Taurus as follows:

> Q. Did he say anything to you when he got back into the car?
>
> A. Yes. I'm screaming, I'm freaking out, I'm like, "What are you doing? What's going on, man." I mean, I'm just, I'm going frantic.
>
> Q. You initially thought he had been shot, right? That's what you said?
>
> A. Yes. Yes.
>
> Q. Okay. So you're, as you asking him what had happened in order to figure out what was going on?
>
> A. Yeah, I said, "Man, what did you do? What happened?" He said, "I robbed that n-----." Excuse my language, but that's what he said.
>
> Q. Did he indicate whether or not that person, the person that he said he just robbed had any money on him?
>
> A. He said he didn't have no money. All he had was the heroin, and a necklace, and the pistol. At that point, I didn't realize he had had something else, till on the drive back.
>
> Q. Okay.

A.    Which was a cell phone.

Q.    Okay.  We'll get there.  Um.  So you're freaking out.
      What's [Woody's] demeanor?

A.    He looked at me, man, like it was, it was like, he went and
      bought a loaf of bread.  He looks at me and says, "*man,
      you ain't never done that before*?"

Q.    Well, let me, let me ask you this.  Does he say anything
      about, um, his feelings toward the person in the other
      vehicle?

A.    He said, "Man, ain't nobody going to miss that n-----.
      Didn't nobody care about him."  And that's when I
      proceed to say, "Man, he's got to have a family, at least a
      mom, children."

Q.    Okay.

A.    I mean.

Q.    Did you express to him, to him any concerns about
      potential forensic evidence against him?  Anything like
      that, that maybe he would get caught?

A.    Yeah, because he was soaked in blood.  And there had to
      be fingerprints all over that.  I mean.

Q.    What was his response to that?

A.    Bullshit.  That was the, uh, that's all he needed.

Transcript Volume 2 at 44-46 (emphasis added).

[16]    The challenged testimony was not introduced to show Woody's propensity to
engage in crime or that his behavior was in conformity with a character trait.
Casteel provided the testimony in response to the prosecutor's question about

Woody's demeanor after he returned to the vehicle, and the prosecutor then asked Casteel if Woody said anything about his feelings toward Joshua. The prosecutor did not ask Casteel about Woody's prior conduct, crimes, or character. The exchange regarding Woody's demeanor and disposition showed the relationship between Woody, Joshua, and Casteel and the context of the events which culminated in Joshua's death. Further, Casteel's responses were relevant to the plan and motive of Woody as the person who shot Joshua and relevant to whether the shooting was a mistake or accident. The admission of the challenged response by Casteel did not violate Evidence Rule 404(b). Similarly, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

[17] Even assuming Casteel's statement that Woody asked him "man, you ain't never done that before" was inadmissible, evidence admitted in violation of Evidence Rules 403 or 404 does not require a conviction to be reversed "if its probable impact on the jury, in light of all the evidence in the case, is sufficiently minor so as not to affect a party's substantial rights." *Houser v. State*, 823 N.E.2d 693, 698 (Ind. 2005) (citations omitted). In light of the overall strength of the State's case and the context of the challenged testimony we conclude that the probable impact on the jury was minor.

[18] Based upon the record, we conclude that any error was not so prejudicial to the rights of Woody that a fair trial was impossible. The admission of Casteel's testimony challenged by Woody did not constitute fundamental error.

## II.

[19] The next issue is whether the evidence is sufficient to sustain Woody's convictions. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* The conviction will be affirmed if there exists evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.*

[20] Ind. Code § 35-42-1-1 governs the crime of murder and provides that a person who knowingly or intentionally kills another human being commits murder, a felony. Ind. Code § 35-42-5-1 governs the crime of robbery and provides in part that a person who knowingly or intentionally takes property from another person or from the presence of another person by using or threatening the use of force on any person or by putting any person in fear commits robbery as a level 5 felony.

[21] Woody argues there is no DNA or fingerprint evidence connecting him to the offense. He states "[t]he record indicates that [he] was probably at the scene of the offense" and argues that his "presence at the crime scene suggests he *could* have robbed and murdered [Joshua], but it does not show beyond a reasonable doubt that he committed the offense." Appellant's Brief at 15-16. He argues that "it is at least equally likely that Casteel killed [Joshua]," that "[l]ike Woody, Casteel was a heroin addict" and "had just as much motive as Woody

to kill [Joshua] and steal his heroin," and that, although the State did not give Casteel any consideration for his testimony, Casteel's motive for contacting the police and testifying against Woody raises serious questions about Casteel's credibility. *Id.* at 16. He also argues that there is no evidence that Casteel's telephone records were ever checked.

[22] The State maintains that the evidence is more than sufficient to sustain Woody's convictions and points to the testimony of Casteel as well as the witnesses who observed the Taurus driven by Woody at the scene of the murder and robbery, the multiple calls between Joshua's phone and the phone registered to Woody's girlfriend at the time of the murder, Woody's statements to Casteel and Dawson following the shooting, and the fact the bullet recovered from Joshua's vehicle was fired from the firearm later discovered in Woody's possession. It also argues that Casteel admitted that his initial motive was to obtain a favorable deal, that Casteel's motive does not mean that the information he gave police was not true, and that the jury was able to judge Casteel's credibility.

[23] To the extent Woody argues that Casteel was not credible, we note that, if there is an existing agreement between the State and one of its witnesses, a prosecutor has a duty to reveal it. *See Whatley*, 908 N.E.2d at 283 (citing *Rubalcada v. State*, 731 N.E.2d 1015, 1024 (Ind. 2000) ("A prosecutor must disclose to the jury any agreement made with the State's witness, such as promises, grants of immunity, or reward offered in return for testimony.")). The purpose of this rule is to assist the jury in assessing the witness's credibility. *Id.* (citation omitted). On

the other hand, the State is not required to disclose a witness's hope of leniency. *Id*. (citing *Seketa v. State*, 817 N.E.2d 690, 694 (Ind. Ct. App. 2004) ("An express agreement requiring disclosure does not exist if a witness testifies favorably in the hope of leniency, and the State neither confirms nor denies leniency to the witness.")).

[24] Here, the State disclosed to the jury the extent to which it had any agreement with Casteel in this or another case, and Woody's counsel cross-examined Casteel before the jury regarding any agreement or hope or expectation for leniency he may have had. The jury was able to assess Casteel's credibility. Woody's arguments as to why Casteel should not be believed amount to an invitation that we reweigh the evidence, which we cannot do. *See Jordan*, 656 N.E.2d at 817.

[25] The jury was able to weigh the credibility of Casteel and the other witnesses and reasonably infer that Woody had shot Joshua and taken a gun, necklace, heroin, and cell phone from him. Based upon the record, we conclude that the State presented evidence of probative value from which a reasonable trier of fact could have found Woody guilty beyond a reasonable doubt of murder and robbery as a level 5 felony.

### *Conclusion*

[26] For the foregoing reasons, we affirm Woody's murder and robbery convictions.

[27] Affirmed.

Bailey, J., and Crone, J., concur.